IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ERIC EUGENE WRAY,

       Plaintiff,

                                 2:12-CV-980-PK

                                 FINDINGS AND
v.                                 RECOMMENDATION

OREGON DEPARTMENT OF CORRECTIONS,
EASTERN OREGON CORRECTIONAL
INSTITUTION, MEDICAL DEPARTMENT OF
EOCI, BEHAVIORAL HEALTH SERVICES
DEPARTMENT OF EOCI, MAX WILLIAMS,
JOYCE DUVAL, and R. PETERS,

       Defendants.

---

PAPAK, Magistrate Judge:

       Plaintiff *pro se* Eric Eugene Wray filed this action *in forma pauperis* against defendants

the Oregon Department of Corrections, the Eastern Oregon Correctional Institution ("EOCI"), the

Medical Health Services Department of EOCI, the Behavioral Health Services Department at

Page 1 - FINDINGS AND RECOMMENDATION

EOCI, Max Williams, Joyce Duval, and R. Peters on May 30, 2012. Wray alleges a total of ten claims against the defendants, described in detail below. This court has federal-question jurisdiction over Wray's claims pursuant to 28 U.S.C. § 1331.

Now before the court is defendants' unenumerated Federal Civil Procedure Rule 12(b) motion (#66) to dismiss Wray's claim for failure to exhaust available administrative remedies and alternative Federal Civil Procedure Rule 12(c) motion for judgment on the pleadings. I have considered the motion and all of the papers and pleadings on file. For the reasons set forth below, defendants' motion should be granted in part and denied in part as discussed below.

## LEGAL STANDARD

### I.    Failure to Exhaust Available Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), incarcerated plaintiffs are required to exhaust all administrative remedies available to them within the institutions in which they are housed before bringing any federal action in connection with prison conditions, including such actions brought under 42 U.S.C. § 1983:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, actions brought with respect to "prison conditions" include all actions brought to challenge isolated episodes of unconstitutional or otherwise unlawful misconduct of any kind as well as prisoner petitions challenging conditions of confinement. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Under the PLRA, the courts lack discretion to consider claims challenging prison conditions, including claims for money

damages, except where such claims are filed following complete exhaustion of available

administrative remedies, without regard to the nature of the available administrative remedies

and without regard to the types of remedies available under such administrative grievance

procedures. *See id.* at 524, *citing Booth v. Churner*, 532 U.S. 731, 739, 740 n. 5, 741 (2001).

Inmates are not required to plead or demonstrate exhaustion before bringing prison-

conditions lawsuits. *Jones v. Bock*, 549 U.S. 199, 216 (2007).  To the contrary, an incarcerated

plaintiff's failure to satisfy the PLRA exhaustion requirement is an affirmative defense that is the

burden of the defendant in a prison-conditions lawsuit to raise and prove. *See id.*  The courts of

the Ninth Circuit treat failure to exhaust administrative remedies "as a matter in abatement, . . .

subject to an unenumerated Rule 12(b) motion" to dismiss. *Wyatt v. Terhune*, 315 F.3d 1108,

1119 (9th Cir. 2003).  In deciding an unenumerated Federal Civil Procedure Rule 12(b) motion to

dismiss for failure to exhaust available administrative remedies, "the court may look beyond the

pleadings and decide disputed issues of fact." *Id.* at 1120.  "If the district court concludes that the

prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim

without prejudice." *Id.*

The PLRA exhaustion requirement is applicable to all persons who are incarcerated at the

time they file their civil actions, without regard to whether they may subsequently be released

from custody prior to resolution of their claims. *See Cox v. Mayer*, 332 F.3d 422, 424-428 (6th

Cir. 2003); *see also Talamantes v. Leyva*, 575 F.3d 1021, 1023-1024 (9th Cir. 2009).

## II.    Judgment on the Pleadings

Federal Civil Procedure Rule 12(c) provides that "[a]fter the pleadings are closed—but

early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ.

P. 12(c). "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (internal modifications omitted), *quoting Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). When deciding a Rule 12(c) motion, the court must assume the truthfulness of the material allegations in the complaint, and all inferences reasonably drawn from these allegations must be construed in favor of the responding party. *See Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989). Thus, judgment may be granted under Rule 12(c) only if the pleadings demonstrate that the moving party is entitled to judgment as a matter of law. *See Fajardo v. County of L.A.*, 179 F.3d 698, 699 (9th Cir. 1999). In consequence, "[a]nalysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez*, 683 F.3d at 1108 internal quotation marks, internal citations omitted).

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6) – and therefore also pursuant to Rule 12(c) – a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a). Instead, the plaintiff must plead

affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). "In sum, for a complaint to survive a motion to dismiss [under Rule 12(c)], the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), *citing Iqbal*, 129 S. Ct. at 1949.

## FACTUAL BACKGROUND[1]

### I.    The Parties

Plaintiff Wray is an incarcerated prisoner housed at all material times at the Eastern Oregon Correctional Institution.

Defendant the Oregon Department of Corrections ("ODOC") is an agency of the State of Oregon charged with managing state prisons in Oregon. Defendant EOCI is the institution in which Wray is housed, and is among the prisons managed by ODOC. Defendants the Medical Health Services Department of EOCI ("MHS") and the Behavioral Health Services Department at EOCI ("BHS") are each administrative divisions of EOCI.

Defendant Williams was the director of ODOC at the time of the events Wray now complains of. Defendant Duval is the manager of BHS. Defendant Peters is a correctional lieutenant in charge of housing assignments at EOCI.

---

[1] Except as otherwise indicated, the following recital of material facts constitutes my construal of the evidentiary record for purposes of defendants' unenumerated Federal Civil Procedure Rule 12(b) motion.

Page 5 - FINDINGS AND RECOMMENDATION

## II.   Material Facts

Wray was housed at EOCI at all times material to his claims.  At EOCI, Wray had available to him a three-level grievance procedure consistent with the regulations set forth in Chapter 292, Division 109 of the Oregon Administrative Rules.

Pursuant to the EOCI grievance procedure and applicable Oregon Administrative Rules, "[i]f an inmate is unable to resolve an issue through informal communications, [the] inmate may seek resolution of the issue by submitting a written grievance using the department's approved inmate grievance form (CD 117)."  OAR-291-109-0140(1)(a).  Any such grievance "must include a complete description of the incident, action, or application of the rule being grieved, including date and approximate time," and should be accompanied by any referenced documents. OAR-291-109-0140(1)(b).  Matters, actions, and incidents that an inmate may properly grieve are the "misapplication of any administrative directive or operational procedure," the "lack of an administrative directive or operational procedure," any "unprofessional behavior or action which may be directed toward an inmate by an employee or volunteer of [ODOC] or the Oregon Corrections Enterprises," any "oversight or error affecting an inmate," any "program failure as defined in . . . OAR-291-077-0020," except where such failure was caused by the inmate's misconduct, or the "loss or destruction of [the inmate's] property. . . ."  OAR-291-109-0140(2). "An inmate grievance may request review of just one matter, action, or incident per inmate grievance form."  OAR-291-109-0140(1)(d).  Similarly, inmates are not permitted to grieve the actions of more than one ODOC employee through a single grievance form, but rather must file one grievance form per ODOC employee whose actions are the subject of the inmate's challenge. *See* OAR-291-109-0140(3)(e).  In addition, inmates are not permitted to grieve any claim or issue

"that the inmate is pursuing in pending litigation in state or federal courts."

OAR-291-109-0140(3)(f). A grievance will not be processed unless it is received by the

applicable grievance coordinator on form CD 117 "within 30 calendar days of the date of the

incident giving rise to the grievance." OAR-291-109-0150(2).

Upon receipt of an inmate grievance, the applicable grievance coordinator is required to

"assign the grievance a number and record its receipt in an inmate grievance log" and to "send a

grievance receipt to the inmate." OAR-291-109-0160(1) and (1)(a). The grievance coordinator

is then required to coordinate with the ODOC employee best suited to respond to the grievance,

and to send the inmate's grievance to that person "for reply." OAR-291-109-0160(1)(b). The

response must "be returned to the grievance coordinator for processing within 21 calendar days."

OAR-291-109-0160(1)(c). Following such processing, the grievance coordinator is required to

send the inmate copies of both the grievance and the response, and to retain copies for the

grievance coordinator's files, all within "45 days from the date the grievance was received" by the

grievance coordinator, "unless further investigation is necessary." OAR-291-109-0160(2). In the

event the grievance coordinator fails to complete processing of the grievance within 45 days of

its receipt, "the grievance coordinator will make an effort to notify the inmate of the status of the

grievance." *Id.* "If the inmate does not receive a response within the allotted time frame, he/she

may contact the grievance coordinator." *Id.*

"If at any time the grievance coordinator determines the inmate has pursued his/her

grievance through state or federal courts, the grievance process will cease and the grievance will

be returned to the inmate." OAR-291-109-0160(4). "A grievance that has been returned to [an]

inmate by the grievance coordinator for procedural reasons cannot be appealed."

Page 7 - FINDINGS AND RECOMMENDATION

OAR-291-109-0160(5).

An inmate may appeal the institutional response to the inmate's grievance by and through "the grievance appeal form (CD 117c)." OAR-291-109-0170(1)(a). Any such appeal "must be submitted to the grievance coordinator together with the original grievance, attachments, and staff response(s)." *Id.* The scope of the originally submitted grievance cannot be expanded on appeal, and the inmate is not permitted to add new information regarding the grieved incident on appeal, except where such information was unavailable to the inmate at the time the original grievance was filed. *See id.* Any such appeal must be received by the grievance coordinator "within 14 days from the date that the grievance response was sent to the inmate from the grievance coordinator." OAR-291-109-0170(1)(b). The grievance coordinator is required to send the appeal to the "functional unit manager," who is required to respond to the appeal "within 30 calendar days." *Id.* The grievance coordinator is then required to send the functional unit manager's appeal response to the inmate. *See* OAR-291-109-0170(2)(c).

In the event an inmate wishes to appeal the functional unit manager's decision regarding a grievance appeal, the inmate may do so "using the grievance appeal form (CD 117c)." OAR-291-109-0170(2)(a). Any such appeal "must be submitted to the grievance coordinator together with the original grievance, attachments, staff responses, and documentation related to the first grievance appeal." *Id.* The grievance coordinator must receive any such appeal "within 14 calendar days from the date that the first grievance appeal response was sent to the inmate from the grievance coordinator." OAR-291-109-0170(2)(c). As with the first appeal, appeal of the functional unit manager's response cannot expand the scope of the original grievance, and cannot adduce new information regarding the originally grieved incident, except where such

Page 8 - FINDINGS AND RECOMMENDATION

information was unavailable to the inmate at the time the original grievance or first appeal was filed. *See* OAR-291-109-0170(2)(a). The grievance coordinator is required to forward any such appeal to "the Assistant Director having authority to review and resolve the issue." *Id.*

The applicable Assistant Director is required to respond to any such appeal from a functional unit manager's grievance appeal response "within 30 calendar days." OAR-291-109-0170(2)(c). "The Assistant Director's . . . decision on an inmate's grievance appeal is FINAL, and is not subject to further [administrative] review." OAR-291-109-0170(2)(d).

Wray has been diagnosed as suffering from post-traumatic stress disorder, asthma, headaches, and gastro-intestinal problems. Wray asserts, without particularity and without evidentiary support, that due to his asthma he qualifies as disabled under the Americans with Disabilities Act. At all material times while housed at EOCI, Wray has been subject to a mental health support plan according to which he is to be housed only in a cell, specifically in a "quiet" cell with a "quiet" cellmate.

On January 27, 2011, Wray filed a complaint with the United States Department of Justice (the "DOJ") regarding conditions of incarceration at EOCI. Wray's complaint specifically named defendants Peters and Duval, albeit peripherally, in connection with complaints regarding the housing of "restricted" inmates in close proximity with other inmates. Among the numerous issues Wray complained of in that complaint was the then-standard practice at EOCI of describing the nature of an inmate's medical issue when calling inmates out for medical appointments. Wray concedes that BHS discontinued the practice of publicly describing the nature of inmates' mental health care appointments shortly after his DOJ complaint was filed, but

that MHS continues to post information publicly regarding the nature of inmates' medical appointments.

Based on a demonstrated record of good behavior, Wray was a "restricted" or "incentive housing" inmate, which entitled him to be housed only with inmates enjoying similar status, and to up to two "incentive moves" between cells per year.  Although he was housed in EOCI's B-1 housing unit, which was an Incentive Housing Unit, with a compatible cellmate, Wray put in a request for transfer to EOCI's H-2 housing unit, also an Incentive Housing Unit, and one which Wray believed was populated by "better behaved inmates."  Wray specifically requested that upon transfer to H-2, he be assigned a cellmate from among a list of candidates Wray himself proposed.  None of Wray's proposed cellmates were at that time housed in H-2.  Wray was initially placed on a waiting list for transfer to H-2, pending the availability of a vacant bunk.

A vacant bunk having become available, on March 21, 2011, defendant Peters approved Wray's request for transfer.  However, rather than assign Wray a cellmate from Wray's own list of proposed candidates, the approved transfer was to a vacant bunk in a cell already housing prisoner Jerry Boone.  Wray elected to accept the transfer.

Also on March 21, 2011, Wray sent a written inmate communication (a "kyte") to defendant Duval to inquire whether she was a member of the Special Needs Inmate Evaluation Committee ("SNIEC"), whether his housing needs were being considered by SNIEC, and whether she had participated in the decision not to assign Wray a cellmate from among his list of proposed candidates.  That same day, Wray sent a kyte to defendant Peters, who served on SNIEC, inquiring whether other SNIEC members had participated in the transfer decision, requesting Peters' reasons for not assigning Wray one of his candidate cellmates, and seeking

clarification of Peters' role in how the transfer decision was implemented.

Boone "immediately" requested a transfer out of Wray's cell.  Defendant Peters approved Boone's transfer, and Wray apparently concedes that Boone's transfer was necessary in order to "avoid a physical confrontation" between Boone and Wray.  Following Boone's transfer, prisoner Chris Duvall was moved to Wray's cell to serve as his new cellmate.  Prisoner Duvall did not prove to be a "quiet" cellmate for Wray, but rather was given to displays of aggression and verbal abuse.

On March 31, 2011, not having received a response to his kyte to defendant Duval of March 21, 2011, Wray filed a grievance regarding Duval's failure to respond.

On April 4, 2011, Wray sent a kyte to an EOCI employee working in BHS to request authorization to participate in a Wellness and Recovery class being offered at EOCI.  The employee to whom Wray's kyte was addressed was on vacation at the time the kyte was sent. Wray did not receive a response to his kyte until after the class had begun.

On April 14, 2011, Wray grieved Peters' conduct in rejecting his request for a cellmate selected from among Wray's proposed candidates.

On April 26, 2011, Peters and Duval each separately responded to Wray's grievances against them.  Duval responded as follows:

> I received your grievance of March 31, 2011, regarding questions about the
> SNIEC committee and previous kytes sent to me.  I have a communication from
> you on notebook paper and apologize for not answering your questions until now.
> I cannot answer all your questions about SNIEC, except that yes, I am a member
> of SNIEC.  In regards to your written communication to me, I have no knowledge
> of your requests about cellmates.

Peters responded as follows:

This is in response to grievance #2011-04-055, wherein you state that as the Assignment Lieutenant, my actions regarding your housing status on or about 3/21/11 'undid' (negated) the conditions under which your previous issue was resolved and violated your rights under A.D.A. and federal law. You were not ordered to move; you requested to move to a different, equivalent unit. You were housed on an incentive celled housing unit with someone you identified as compatible. You requested to live on a different celled housing unit. Your name was placed on a waiting list, and when a spot opened, you were given an opportunity to move to the open bunk. You would not have been in any way penalized for not accepting the open bunk. Your current assignment was made at your request. It was not an administrative decision; it was not a move enacted by the administration for facility management; you would not have faced any sort of disciplinary action for refusal to move. As the Assignment lieutenant, my only action was to facilitate your request. Therefore, I am not responsible for your choices, and I consider the matter resolved. As always, you are encouraged to use the incentive move process to find a compatible cell-mate. As an incentive housing-assigned inmate, you are granted two moves a year. To my knowledge, you have not availed yourself of that opportunity since your requested reassignment to H Unit; should you choose to do so, your request will in all likelihood be granted.

Wray did not appeal from either Duval's or Peters' response.

On or around that same date Peters responded to Wray's kyted questions to him, indicating that he, Peters, had made all decisions regarding Wray's transfer of March 26, 2011, without input from other SNIEC members, that Wray was not assigned any of his proposed candidate cellmates because those candidates were not at that time housed in the H Unit to which Wray had requested transfer, and that Wray had been under no obligation to accept the incentive move to H Unit.

On April 28, 2011, Wray filed a DOJ complaint regarding the failure to house him with a cellmate from among his list of proposed candidates. In May 2011, Wray filed a state tort claim complaint regarding the same failure.

On July 8, 2011, Wray's cellmate Duvall created a disturbance requiring intervention by

prison guards. Later that month, Wray filed a written request for a new cellmate. On July 26,

2011, Peters approved Wray's request. It appears to be undisputed that Wray now considers his

cellmate to be compatible, and that he is now being housed in compliance with his mental health

support plan.

ANALYSIS

I.    **Wray's Claims**

By and through his first-enumerated claim for relief, Wray alleges Peters' liability in his

individual and official capacities under 42 U.S.C. § 1983 for the violation of Wray's rights under

the Eighth Amendment in connection with Wray's cellmate assignments between March 21 and

July 26, 2011.

By and through his second-enumerated claim for relief, Wray alleges the liability of both

Peters and Duval in their individual and official capacities under Section 1983 for retaliation in

violation of Wray's First Amendment right to free speech in connection with Wray's DOJ

complaint of January 27, 2011. Specifically, Wray alleges that Peters retaliated against Wray for

naming him in the January 2011 DOJ complaint by refusing to give Wray one of his requested

cellmates on March 21, 2011, and by failing to provide timely response to Wray's kyte of March

21, 2011. Wray alleges that Duval retaliated against him for naming her in the January 2011

DOJ complaint by failing to provide timely response to Wray's kyte of March 21, 2011, and by

managing BHS in such a manner that Wray was not permitted to take the Wellness and Recovery

class in April 2011.

By and through his third-enumerated claim for relief, Wray alleges Peters' liability in his

individual and official capacities for violation of Wray's rights under the Americans with

Disabilities Act (the "ADA") in connection with Wray's cellmate assignments between March 21 and July 26, 2011.

By and through his fourth-enumerated claim for relief, Wray alleges Duval's liability in her individual and official capacities for violation of Wray's rights under the ADA in connection with the failure of BHS to sign Wray up for the Wellness and Recovery class in April 2011. Specifically, Wray alleges that Duval denied him meaningful access to BHS services and classes by failing to assure that someone responded to his kyte of April 4, 2011, in its addressee's absence, and by failing to provide timely response to his kyte of March 21, 2011.

By and through his fifth-enumerated claim for relief, Wray alleges BHS' liability and Williams' liability in his personal and official capacities under Section 1983 for the violation of Wray's substantive due process rights in connection with EOCI's former practice, discontinued since early 2011, of publicly posting information regarding the purposes of inmates' mental health care appointments.

By and through his sixth-enumerated claim for relief, Wray alleges MHS' liability under Section 1983 for the violation of Wray's substantive due process rights in connection with the practice of publicly posting information regarding the purposes of inmates' medical health care appointments.

By and through his seventh-enumerated claim for relief, Wray alleges the liability of both MHS and BHS under the ADA and the Rehabilitation Act (the "RA") in connection with the practice of publicly posting information regarding the purposes of inmates' health care appointments.

By and through his eighth-enumerated claim for relief, Wray alleges that ODOC is in

violation of 28 C.F.R. § 40.3, pursuant to which each correctional institution's "written grievance

procedure shall be readily available to all . . . inmates of the institution," and of 28 C.F.R. §

35.107, pursuant to which any public entity that employs 50 or more persons is required to "adopt

and publish grievance procedures providing for prompt and equitable resolution of complaints"

of, *inter alia*, disability discrimination.

By and through his ninth-enumerated claim for relief, Wray alleges that ODOC's

administrative grievance procedures are constitutionally inadequate in that they do not make

clear that exhaustion of available administrative remedies is a prerequisite to filing a lawsuit to

challenge the terms and conditions of confinement.

By and through his tenth-enumerated claim for relief, Wray alleges ODOC's liability and

Williams' liability in his individual and official capacities for the promulgation of constitutionally

inadequate grievance procedure regulations.

## II.    Defendants' Motion

Defendants move for dismissal of all of Wray's claims for failure to exhaust available

administrative remedies.  In the alternative, defendants move for judgment on the pleadings as to

any claims that may survive dismissal for failure to exhaust.

### A.    Failure to Exhaust Available Administrative Remedies

As noted above, under the Prison Litigation Reform Act incarcerated plaintiffs are

required to exhaust all administrative remedies available to them within the institutions in which

they are housed before bringing any federal action in connection with prison conditions,

including actions brought under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the

Rehabilitation Act. *See* 42 U.S.C. § 1997e(a); *see also Wyatt*, 315 F.3d at 1120; *O'Guinn v.*

*Lovelock Corr. Ctr.*, 502 F.3d 1056, 1061 (9th Cir. 2007). Under the PLRA, the courts lack

discretion to consider claims challenging prison conditions, including claims for money damages,

except where such claims are filed following complete exhaustion of available administrative

remedies, without regard to the nature of the available administrative remedies and without

regard to the types of remedies available under such administrative grievance procedures. *See*

*Porter*, 534 U.S. at 524, *citing Booth*, 532 U.S. at 739, 740 n. 5. For purposes of the PLRA,

"complete exhaustion" of available administrative remedies requires that an inmate "complete the

administrative review process in accordance with [all] applicable procedural rules, including

deadlines. . . ." *Marella v. Terhune*, 568 F.3d 1024, 1027 (9th Cir. 2009), *quoting Woodford v.*

*Ngo*, 548 U.S. 81, 88 (2006).

      I analyze the application of the PLRA exhaustion requirement to Wray's claims below.

      **1.    Wray's First- Through Fourth-Enumerated Claims**

      By and through each of his first- through fourth-enumerated claims for relief, Wray

clearly challenges the conditions of confinement at EOCI and alleges one or more defendants'

liability under a federal statutory scheme (specifically, 42 U.S.C. § 1983, the ADA, or the RA).

In consequence, under the PLRA Wray is required to exhaust all available administrative

remedies in connection with the conditions complained of in each of those four claims before this

court may properly consider the merits thereof. As noted above, it is the defendants' burden to

establish in support of their motion that Wray in fact failed to do so.

      Defendants offer evidence tending to establish that at EOCI Wray had available to him

the three-level grievance procedure described in detail above, that he had been informed

regarding the administrative procedures available, and that the procedures were described in

detail in an inmate handbook available to him. Wray does not offer countervailing evidence or

dispute that he was aware of the grievance procedures and their operation. Instead, Wray argues

that he pursued grievances regarding the complained-of conduct until it became clear to him that

further pursuit of administrative remedies through the grievance process was futile, and that no

further remedy was, as a practical matter, available.

      As discussed above, it is undisputed that Wray filed grievances in connection with the

conditions complained of in connection with his first- through fourth-enumerated claims for

relief. It is further undisputed that he received responses to those grievances, and that he elected

not to appeal them to the next level of the available administrative procedure. In consequence,

defendants have met their burden to establish that administrative remedies were not exhausted,

and the burden shifts to Wray to establish the effective unavailability of the remedies he declined

to pursue further. *See Albino v. Baca*, 697 F.3d 1023, 1031 (9th Cir. 2012). Wray can meet this

burden by establishing that the remedies provided under EOCI's grievance system were

"ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Hilao v. Estate of*

*Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996); *see also, e.g., Brown v. Valoff*, 422 F.3d 926,

935 (9th Cir. 2005).

      Wray argues, first, that his failure to pursue further available administrative remedies

must be excused in light of what he characterizes as "retaliatory" conduct by defendants Peters

and Duval. However, the retaliatory conduct to which Wray cites in support of his argument is

largely the same conduct that was the subject of the grievances themselves: Peters' purported

failure to comply with Wray's mental health support plan in approving Wray's request for a

transfer to H unit without assigning him one of his proposed candidate cellmates, and Peters' and

Duval's conduct in failing to provide timely responses to Wray's kytes.

As a matter of law, such conduct is not sufficient to relieve Wray of the obligation to exhaust available administrative remedies. Wray offers no evidence that he received threats or experienced any degree of intimidation in connection with his availment of EOCI grievance procedures, but rather asserts only that he "decided" that Peters' and Duval's conduct "warranted not pursuing grievances directly toward them any further. . . ." "The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004). It is clear, here, that a prisoner of ordinary firmness would not have been deterred from pursuing available remedies to exhaustion by Peters' and Duval's conduct, which as alleged was entirely non-threatening. Indeed, it is difficult to see in what way the defendants' conduct could colorably be construed even as tending to render the grievance procedure effectively unavailable, given that both Peters and Duval provided civil, well-reasoned, reasonably prompt responses to Wray's grievances against them, and that Peters articulated an entirely reasonable justification for his failure to assign Wray one of the cellmates he hoped for.

Second, Wray argues that he exhausted his remedies in connection with his grievance of Peters' conduct, because he was advised in May 2011 – after he had filed his state tort claim regarding that same conduct – that no appeal of that grievance would be accepted in light of his pending tort claim action premised in the same conduct. Exhaustion of administrative remedies for PLRA purposes requires an inmate to properly follow all applicable procedural rules. *See Marella*, 568 F.3d at 1027. Bringing a premature close to the administrative process before all

Page 18 - FINDINGS AND RECOMMENDATION

levels of appeal are exhausted does not satisfy the PLRA exhaustion requirement. *See Woodford*, 548 U.S. at 90-91.

Wray having failed to meet his burden to establish the unavailability of further administrative remedy in connection with his first- through fourth-enumerated claims for relief, the court is without discretion to consider the merits of those claims. Defendants' unenumerated Federal Civil Procedure Rule 12(b) motion should therefore be granted as to those four claims, and each of those claims should be dismissed. Moreover, Wray is now time-barred from further pursuit of administrative remedy in connection with those claims. *See* OAR-291-109-0150(2). Thus, Wray's first- through fourth-enumerated claims should be dismissed with prejudice.

## 2.      Wray's Fifth- Through Seventh-Enumerated Claims

By and through each of his fifth- through seventh-enumerated claims for relief, Wray challenges the constitutionality and/or legality of specified procedures governing aspects of inmate life at EOCI. These claims are therefore clearly subject to the PLRA exhaustion requirement. It is undisputed that Wray did not file any formal grievance regarding any of the conduct underlying these claims. Wray takes the position that the conduct underlying these claims could not be grieved, and therefore that the PLRA does not bar this court from considering their merits notwithstanding his failure to exhaust available administrative remedies, in that no administrative remedies were available. Wray's position is at odds with OAR-291-109-0140(2), which permits an inmate to grieve, *inter alia*, the "misapplication of any administrative directive or operational procedure," the "lack of an administrative directive or operational procedure," any "unprofessional behavior or action which may be directed toward an inmate by an employee or volunteer of [ODOC] or the Oregon Corrections Enterprises."

Page 19 - FINDINGS AND RECOMMENDATION

Violation of an inmate patient's confidentiality rights, whether or not pursuant to official policy, clearly constitutes both unprofessional conduct directed at the inmate and either the misapplication of or the absence of an appropriate operational procedure. Administrative grievance procedures were therefore available to Wray in connection with the conduct underlying these claims, and the evidence establishes that Wray did not, in fact, exhaust those procedures. The burden accordingly falls to Wray to establish that remedies were not effectively available under those procedures. *See Albino*, 697 F.3d at 1031.

Wray attempts to meet his burden only in connection with his fifth-enumerated claim for relief and his seventh-enumerated claim to the extent alleged against BHS, each of which arises out of BHS' discontinued practice of publicly posting information regarding the purposes of inmates' mental health care appointments. As Wray argues, he successfully obtained all remedies available to him through the grievance process via informal communications prior to filing any formal grievance (namely, the discontinuance of the practice), and that therefore filing a formal grievance would have been superfluous.[2] I agree with Wray that, under the circumstances, he achieved exhaustion of available administrative remedies without filing a formal grievance. Defendants' unenumerated Rule 12(b) motion should therefore be denied as to Wray's fifth-enumerated claim for relief and seventh-enumerated claim for relief to the extent alleged against BHS.

Wray offers no argument that grievance would have been futile in connection with either his sixth-enumerated claim for relief or his seventh-enumerated claim for relief to the extent

---

[2] The remedy Wray now seeks through these claims is limited to money damages, which would not have been available to him through the grievance process.

alleged against MHS.  Defendants' unenumerated Rule 12(b) motion should therefore be granted

as to those claims.  However, because the complained-of practice of publicly posting information

regarding the purposes of inmates' medical health care appointments that underlies those claims

allegedly remains ongoing, Wray is not barred from exhausting available administrative remedies

in connection with those claims in the future.  Wray's sixth-enumerated claim for relief and

seventh-enumerated claim for relief to the extent alleged against MHS should therefore be

dismissed without prejudice.

### 3.    Wray's Eighth- Through Tenth-Enumerated Claims

By and through his eighth- through tenth-enumerated claims, Wray challenges the

adequacy, constitutionality, and/or legality of EOCI's inmate grievance procedures themselves.

The determination whether such challenges are within the scope of the PLRA presents an

unresolved question of law.

The PLRA requires exhaustion as a prerequisite only of suits "brought with respect to

prison conditions."  42 U.S.C. § 1997e(a).  The threshold issue, therefore, is whether a challenge

to institutional grievance procedures constitutes a challenge to prison conditions.  There is a

colorable argument that it does not.  It is well settled that in the absence of any contrary

expression of legislative intent, the courts "presume[] that Congress expects its statutes to be read

in conformity with the [U.S. Supreme] Court's precedents."  *United States v. Wells*, 519 U.S. 482,

495 (1997).  Prior to the enactment of the PLRA in its present form, in the course of discussing

the more generally applicable doctrine requiring exhaustion of administrative remedies before

invoking the equitable jurisdiction of a court, the Supreme Court found the exhaustion doctrine

inapplicable to suits challenging the adequacy of the available administrative remedies

themselves. *See Gibson v. Berryhill*, 411 U.S. 564, 574-575, 575 n. 14 (1973). On the

presumption that the PLRA exhaustion requirement is to be interpreted in conformity with the

rule affirmed in *Gibson*, it would be reasonable to conclude that Congress did not intend

prisoners to be required to exhaust administrative remedies before initiating a judicial challenge

to the adequacy of those same administrative remedies themselves. Nevertheless, because

governing case law makes clear that the scope of the PLRA exhaustion requirement is to be

construed broadly, *see Porter*, 534 U.S. at 532, I decline so to conclude, and assume *arguendo*

that challenges to the adequacy of grievance procedures constitute challenges to prison

conditions subject to the PLRA exhaustion requirement.

On that assumption, the court must determine what, if any, administrative remedies were

available to Wray in connection with his challenges. As noted above, matters, actions, and

incidents that an inmate may challenge through the grievance system are limited to the

"misapplication of any administrative directive or operational procedure," the "lack of an

administrative directive or operational procedure," any "unprofessional behavior or action which

may be directed toward an inmate by an employee or volunteer of [ODOC] or the Oregon

Corrections Enterprises," any "oversight or error affecting an inmate," any "program failure as

defined in . . . OAR-291-077-0020," except where such failure was caused by the inmate's

misconduct, and the "loss or destruction of [the inmate's] property. . . ." OAR-291-109-0140(2).

Wray's challenge does not suggest that EOCI has misapplied or is misapplying the

Administrative Rules setting forth the parameters of the grievance procedure, but rather that the

promulgated Rules themselves are inadequate, unconstitutional, and/or illegal. Similarly, Wray

is not clearly grieving the absence of a required administrative directive or operational procedure,

Page 22 - FINDINGS AND RECOMMENDATION

but rather the inadequacy of the existing procedures to safeguard the constitutional and/or

statutory rights of EOCI inmates. Wray's challenge clearly does not depend on an allegation of

unprofessional conduct directed toward him by prison staff, an oversight or error, a program

failure, or the loss of his personal property. I therefore conclude that the grievance procedures

available to Wray did not provide any mechanism for his challenges to the grievance procedures

themselves.

Because no relief was available to Wray under EOCI's administrative procedures in

connection with Wray's eighth- through tenth-enumerated claims, the PLRA does not bar the

court from considering their merits. *See Albino*, 697 F.3d at 1030 ("As explicitly stated in the

PLRA, the PLRA requires that an inmate exhaust only those administrative remedies as are

available") (internal quotation marks and modifications omitted), *quoting Sapp v. Kimbrell*, 623

F.3d 813, 822 (9th Cir. 2010), *quoting* 42 U.S.C. § 1997e(a). Defendants' unenumerated Rule

12(b) motion should therefore be denied as to Wray's eighth- through tenth-enumerated claims

for relief.

### B.    Judgment on the Pleadings

By and through their alternative motion for judgment on the pleadings, defendants seek

dismissal of Wray's eighth- through tenth-enumerated claims for relief, as well as dismissal of

each of Wray's claims to the extent it may be alleged against any of the individual defendants in

their personal capacities for violation of the ADA or the RA.

It is not a simple matter to determine precisely the substance of the challenge mounted

against EOCI's administrative procedures by and through Wray's eighth- through tenth-

enumerated claims. Wray's allegations and arguments in support of those claims are imprecise at

Page 23 - FINDINGS AND RECOMMENDATION

best, and are frequently ambiguous; moreover, the distinctions Wray evidently draws among the three claims are by no means clear. Considered collectively, however, it appears reasonably clear that Wray's challenges are premised on the purported failures of the administrative grievance process to state, set forth, describe or otherwise track the PLRA exhaustion requirement itself, and to state, set forth, describe or otherwise track the causes of action available to claimants under the ADA.

So construed, I conclude that none of the three causes of action states a claim upon which relief can be granted. In respect of the purported failure of the administrative grievance process to state, set forth, describe or otherwise track the PLRA exhaustion requirement, such purported failure cannot as a matter of law and of logic be either constitutionally or statutorily defective. The PLRA exhaustion requirement was enacted by the United States Congress, and is purely a creature of federal law. The PLRA exhaustion requirement is applicable to the grievance procedures available to inmates in all American jurisdictions, without regard to the particular details of the various procedures available in the different states and territories. Where a local jurisdiction provides for an applicable administrative remedy, an inmate is required to exhaust the procedures locally available for seeking or requesting that remedy, and where local procedures do not provide any applicable remedy, the PLRA does not require exhaustion.

By contrast, the grievance procedures available to inmates at EOCI are purely a creature of state agency regulatory authority. The promulgators of the Administrative Rules setting forth those procedures entirely lack authority to regulate the matters governed by the federal PLRA. Indeed, the purpose of the grievance procedures themselves – to provide inmates a mechanism for bringing meritorious challenges to the conditions of confinement to the attention of persons

with authority to correct defective policies or procedures – is unrelated to the purpose of the

PLRA exhaustion requirement, which is to ensure that before the courts hear such a challenge,

prison officials have had a full opportunity to consider and respond to the prisoner's allegations.

It would serve no legitimate purpose of ODOC, the state agency responsible for promulgating the

administrative grievance procedure, to require prisoners to appeal every adverse grievance

decision, and ODOC, unlike the United States Congress, in any event lacks authority to condition

prisoner lawsuits on exhaustion of administrative remedies.  In consequence, this court cannot

properly enjoin any defendant named in this action to amend Chapter 291, Division 109 of the

Oregon Administrative Rules to state, set forth, describe or otherwise track the PLRA exhaustion

requirement.

    In respect of the purported failure of the administrative grievance process to state, set

forth, describe or otherwise track the causes of action available to claimants under the ADA,

similar considerations apply.  Again, the ADA is a creature of federal law, and it is outside the

authority of any state agency to regulate matters governed thereunder.  More critically, ODOC is

without any responsibility or obligation to tailor its grievance procedures to the requirements of

the ADA, or otherwise to educate inmates as to its provisions.  The purpose of the administrative

grievance procedure is to provide a mechanism for inmates to present the grounds of their

challenges to the conditions of confinement to the attention of persons with authority to correct

defective policies or procedures; to learn about ADA requirements, inmates must look to federal

law.  It follows that this court cannot properly enjoin any defendant named in this action to

amend EOCI's administrative grievance procedures to state, set forth, describe or otherwise track

the causes of action available to claimants under the ADA.

Page 25 - FINDINGS AND RECOMMENDATION

In addition to the foregoing, I note that by and through his eighth-enumerated claim for relief, Wray alleges that administrative grievance procedures available to EOCI inmates are in violation of 28 C.F.R. § 40.3 and § 35.107. I am aware of no authority for the proposition that either code section gives rise to any private right of action to enforce such purported violations. Moreover, under the framework established in *Alexander v. Sandoval*, 532 U.S. 275 (2001), it is clear that neither code section is enforceable through a private right of action.

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979) (remedies available are those "that Congress enacted into law"). The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 62 L. Ed. 2d 146, 100 S. Ct. 242 (1979). Statutory intent on this latter point is determinative. *See, e.g., Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991); *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 812, n. 9, 92 L. Ed. 2d 650, 106 S. Ct. 3229 (1986) (collecting cases). Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145, 148, 87 L. Ed. 2d 96, 105 S. Ct. 3085 (1985); *Transamerica Mortgage Advisors, Inc. v. Lewis, supra*, at 23; *Touche Ross & Co. v. Redington, supra*, at 575-576. "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991) (SCALIA, J., concurring in part and concurring in judgment).

*Alexander*, 532 U.S. at 286-287. "Thus, [*Alexander*] instructs that because only Congress can create a private right of action through statute, we must examine a challenged regulation in the context of the statute it is meant to implement." *Lonberg v. City of Riverside*, 571 F.3d 846, 850-851 (9th Cir. 2009). "Only those regulations effectuating the statute's clear prohibitions or requirements are enforceable through the statute's private right of action; regulations that do not

encapsulate the statutory right and corresponding remedy are not privately enforceable." *Id.*

Here, 28 C.F.R. Part 40 implements the PLRA itself. Congress unambiguously did not create any private right of action in connection with the provisions of the PLRA. It follows that no private right of action exists in connection with the code sections within Part 40. Similarly, 28 C.F.R. Part 35 implements the ADA. The rights of action provided under the ADA are in no way dependent upon the availability of published grievance procedures providing for prompt and equitable resolution of complaints leveled against public entities employing 50 or more persons. Under *Alexander*, this court therefore may not import any private right of action to enforce the code sections within Part 35. In consequence, Wray's eighth-enumerated cause of action does not state a claim upon which relief can be granted by this court, providing additional support for the conclusions that defendants' motion for judgment on the pleadings should be granted as to the eighth-enumerated claim, and that the claim should be dismissed with prejudice.

I further note that, in articulating his ninth- and tenth-enumerated claims, Wray fails to allege that the complained-of inadequacies or constitutional/statutory deficiencies of the grievance procedure caused him to suffer any cognizable damage.[3] In consequence, Wray lacks standing to bring these claims. The Supreme Court articulated the three elements necessary for constitutional standing in *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). Under *Lujan*, a plaintiff must have suffered an injury in fact, there must be a causal connection between the injury and the conduct of the defendant, and it must be likely that the injury can be redressed by a

---

[3] I acknowledge that Wray alleges, without particularity, that the deficiencies of the grievance procedure "jeopardize" the health and safety of EOCI inmates generally, but he does not allege that he himself actually suffered an injury, or allege facts from which it could be inferred that any injury he suffered was caused by the complained-of deficiencies.

favorable decision. *Id.* at 560-561. To satisfy the "injury in fact" requirement, the plaintiff's cognizable injury must be either "actual or imminent." *Id.* at 564.

In light of the discussion above regarding ODOC's lack of authority to promulgate regulations to state, set forth, describe or otherwise track either the PLRA exhaustion requirement or the causes of action available to claimants under the ADA, moreover, it is clear that Wray will be unable to amend his pleading to cure the defects in his standing to bring these claims. That is, he cannot establish that the complained-of deficiencies could have been the cause of any injury he may have suffered, and cannot establish that any such injury would be redressed in the event he prevailed on his claims. In consequence of the foregoing, Wray's lack of standing provides additional support for the conclusions that defendants' motion for judgment on the pleadings should be granted as to his ninth- and tenth-enumerated claims, and that the claims should be dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, defendants' unenumerated Federal Civil Procedure Rule 12(b) motion (#66-1) should be granted as to Wray's first- through fourth-enumerated claims sixth-enumerated claim, and seventh-enumerated claim to the extent alleged against MHS, and otherwise denied, and defendants' alternative Federal Civil Procedure Rule 12(c) motion (#66-2) should be granted as to Wray's eighth- through ninth-enumerated claims. Wray's first- through fourth- and eighth- through tenth-enumerated claims should be dismissed with prejudice, and his sixth-enumerated claim and seventh-enumerated claim to the extent alleged against MHS should be dismissed without prejudice. Wray's fifth-enumerated claim and seventh-enumerated claim to the extent alleged against BHS should survive defendants' motion.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge.  These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.


Dated this 1st day of May, 2013.

Honorable Paul Papak
United States Magistrate Judge